IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: ) | | |
| KEVIN RAY and YVETTE MARIE, ) | | |
| ASBURY ) | Case No. 08-21989 | |
| Debtors. ) | Chapter 7 | |
| _____ ) | | |
| ) | | |
| THE CALLAWAY BANK, ) | Adversary No. 09-02012 | |
| Plaintiff, ) | | |
| v. ) | | |
| ) | | |
| KEVIN RAY and YVETTE MARIE ) | | |
| ASBURY ) | | |
| Defendants. ) | | |
| ) | | |

**MEMORANDUM OPINION**

This adversary comes before the Court on the complaint filed by the plaintiff The Callaway Bank ("Plaintiff" or "Callaway") against Kevin Ray Asbury ("Kevin") and Yvette Marie Asbury ("Yvette") or collectively referred to herein as ("Debtors"). In the complaint, Callaway asserts that Kevin's and Yvette's debt to Callaway should be declared nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (B), (a)(4) and (a)(6).[1] This is a core proceeding under 28 U.S.C. §157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court grants Callaway's claim against Yvette under §523(a)(2)(B).

---

[1] In its Order Granting In Part and Denying In Part Plaintiff's Motion for Summary Judgment, issued on September 15, 2010 ("Order"), the Court granted Callaway partial summary judgment against Kevin Asbury on Callaway's § 523(a)(2)(B) claim, and found Kevin's debt to Callaway nondischargeable.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As this Court previously found in its Order, on March 8, 2007, Debtors executed a combined promissory note and security agreement for the principal amount of $4,000,000,000 ("Note and Security Agreement").[2]  As security for the loan, Debtors pledged "all livestock now owned or hereafter acquired wherever located in whatever form and any additions or accessions thereof."  In an effort to obtain additional advances on the loan, Kevin prepared and presented Callaway with a Borrowing Base Certificate which stated that Debtors owned 4,667 head of cattle as of May 30, 2007.  Callaway relied on the Borrowing Base Certificate in making advancements on the loan.

The evidence that the Court relied upon in finding the debt nondischargeable as to Kevin under §523(a)(2)(B) included the following: (1) Kevin's admission at his 2004 examination that the most cattle he ever owned was "probably 2000" in the year 2008, (2) testimony from Kevin's and Yvette's farmhand, Larry Vukadin, who said that Debtors did not have 4,667 head of cattle as of the date of the Borrowing Base Certificate, and that the number of cattle they owned on all of their farms was likely far less than that, perhaps around 1,000, (3) Kevin's testimony that he had "several hundred head of cattle" in his possession as of October 1, 2008, and zero on the date they filed for bankruptcy, but that he did not really know what happened to them, and (4) Kevin's election to take the Fifth Amendment when asked where all of the cattle had gone.

On October 31, 2008, Yvette and Kevin filed their voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  Callaway filed this adversary proceeding and then a motion for summary judgment against Debtors.  The Court issued its Order granting Callaway summary

---

[2] Callaway's Exhibit No. 2.

judgment as to Kevin under §523(a)(2)(B).[3] The Court found summary judgment was improper as to Yvette as there remained genuine issues of material fact regarding whether she and Kevin were partners, and whether she knew or should have known that he fraudulently reported financial information to Callaway. The Court found that the Debtors are jointly and severally liable to Callaway on the Note for the sum of $3,071,599.88.

After the Court's consideration of the testimony of the witnesses at trial as well as the documents submitted into evidence, the Court is persuaded that there was a partnership between Yvette and Kevin in the business of buying and selling cattle. The Court is also convinced that because Yvette signed the Note and Security Agreement to obtain the loan, pledged as collateral the cattle she owned and thereafter acquired, and represented in the Security Agreement that she actually owned all of the cattle that she pledged as security, and promised to protect Callaway's security interest in those cattle, that she should have known at any given time how many cattle she actually owned. Furthermore, the Court is convinced that Yvette should have made herself aware of any financial information that was being conveyed to Callaway by her partner regarding their loan and their collateral.

## II. LEGAL ANALYSIS

Section 523(a)(2)(B) provides:

    (a) A discharge under 727. . . of this title does not discharge an individual debtor from any debt-

        (2) for money, property, services, or an extension, renewal, or refinancing of

---

[3] The Court left open the question of nondischargeability under §§ 523(a)(2)(A), (a)(4) and 523(a)(6) as to both parties.

3

    credit, to the extent obtained by-

      (B) use of a statement in writing–

        (i) that is materially false;

        (ii) respecting the debtor's or an insider's financial condition;

        (iii) on which the creditor ... reasonably relied; and

        (iv) that the debtor caused to be made published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

  Callaway, as the objecting creditor, has the burden of proving every element of § 523(a)(2)(B). *See Valley Nat'l Bank v. Bush (In re Bush)*, 696 F.2d 640, 644 (8th Cir.1983); *see also Dakota Bank and Trust Co. of Fargo v. Storey (In re Storey),* 1986 WL 713499 (D. N. D.). This burden must be met by a preponderance of the evidence. *First Nat'l Bank of Olathe, Kansas v. Pontow*, 111 F.3d 604, 698 (8th Cir.1997) (*citing Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct 654, 659-60, 112 L.Ed.2d 755 (1991); *Bush*, 696 F.2d at 644.). Evidence in support of a § 523(a)(2) cause of action must be viewed consistent with the congressional intent that exception to discharge be narrowly construed against the creditor and liberally construed against the debtor, thus effectuating the "fresh start" policy of the Code. *Dakota Bank*, 1987 WL at *5 (*citing In re Hunter*, 36 B.R. 28, 31 (Bankr. D. N.D.1983), *rev'd on other grounds*, 771 F.2d 1126 (1985)); *see also Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 879-80 (5th Cir.1982).

  The Court previously found that Kevin obtained additional advances from Callaway by presenting a Borrowing Base Certificate which contained fraudulent statements regarding his and

Yvette's livestock collateral, that Callaway relied on the Certificate in advancing additional funds, that the reliance was reasonable, and that Kevin's debt to Callaway is, therefore, nondischargeable under § 523(a)(2)(B).[4] Callaway argues that Yvette's debt should also be nondischargeable on a vicarious liability theory because she is not only Kevin's spouse, but she was, at all relevant times, his business partner as well. There are two primary issues for the Court to consider in making this determination. The first is whether Yvette and Kevin were business partners. If they were, the second issue is whether she knew or should have know that he presented a fraudulent financial document to Callaway in order to obtain additional advances or if she was recklessly indifferent to what financial information he provided to Callaway.

### A. Partnership

A partnership is statutorily defined as "an association of two or more persons to carry on as co-owners [of] a business for profit." *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. Ct. App. 2002) (*citing* Mo. Rev. Stat. § 358.070 (1994)). A partnership has also been judicially defined as "a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions." *Meyer v. Lofgren*, 949 S.W.2d 80, 82 (Mo. Ct. App. 1997) (*quoting Kielhafner v. Kielhafner*, 639 S.W.2d 288, 289 (Mo. Ct. App. 1982)). A partnership agreement may be written, expressed orally, or implied from the acts and conduct of the parties. *Morrison v. Labor & Indus. Relations Comm'n.*, 23 S.W.3d. 902, 908 (Mo. Ct. App. 2000). The intent of the parties is the primary factor for determining whether such a relationship exists. *Binkley v. Palmer*, 10 S.W.3d. 166, 169 (Mo. Ct. App. 1999). The required intent necessary to find that a

---

[4] See Order.

partnership exists "is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership." *Meyer*, 949 S.W.2d at 82. It is Callaway's burden to prove by "clear, cogent, and convincing" evidence that Kevin and Yvette operated as though they were partners in the cattle business, such that it would be proper to impute liability upon Yvette for Kevin's fraudulent conduct. *See Hillme*, 75 S.W.3d at 317.

The Court is mindful that some courts are reluctant to impute intent from one spouse to the other so as to prevent discharge of an innocent spouse's debt. *See e.g. O'Donnel v. Floyd (In re Floyd)*, 177 B.R. 985 987-88 (Bankr. M.D. Fla. 1995) (finding that a husband's fraud would not be imputed to his wife in the absence of specific proof of an agency relationship); *Landmark Leasing, Inc. v. Martz (On re Martz)*, 88 B.R. 663, 676 (Bankr. E.D. Pa. 1988) (Court refused to impute husband's intent to deceive wife under § 523(a)(2)(B) where wife had delegated all of her financial dealings to her husband). Courts do, however, make a distinction between spouses who are involved in a business or partnership relationship and spouses who are not operating a business, and when spouses have a business relationship, courts will usually apply some variety of agency law to impute intent under § 523(a)(2). *See Aribank v. Gordon (In re Gordon)*, 293 B.R. 817, 824 (Bankr. M.D. Ga. 2003) (*citing Luce v. First Equip Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1284 n. 10 (5th Cir. 1992) (per curiam)).

There is no evidence of a written or oral partnership agreement in this case. However, evidence of the parties actions and conduct provide sufficient evidence to support the Court's conclusion that Kevin and Yvette were partners in the cattle business. In finding the existence of a partnership, the Court relies on the following facts:

(1) Yvette benefitted from the income generated from the business;

(2) between March 2007 and March 2008, Yvette drew thirty-one (31) checks on the business account at Callaway, totaling $61,4000 of which she was the payee;[5]

(3) between March 2007 and February 2008, Kevin drew twenty-two (22) checks on the Callaway account totaling $94,609.78, of which Yvette was the payee;[6]

(4) a substantial number of the checks which Yvette wrote to herself and which Kevin wrote to Yvette contained the designation "draw" in the memo line;[7]

(5) Yvette endorsed cattle sale checks for deposit into her's and Kevin's personal account at Commercial Trust Company under the name of "Kevin Asbury, Yvette Asbury, DBA R&K Angus DBA Joint Angus Genetics" and Yvette admitted in her deposition testimony that she and Kevin were in business together as "Joint Agnus Genetics or Angus Genetics";[8]

(6) Yvette and Kevin held themselves out as partners as evidenced by a receipt of a wire transfer of $223,985 from "Wm. Kuegel Jr. DBA Kuegel Tobacco Co." in both of their names;[9]

(7) Yvette wrote three (3) checks from the business account at Commercial Trust Company, two (2) of which were to pay employees;[10]

(8) Yevette and Kevin each individually signed the Note and Security Agreement dated March 8, 2007 for the loan from Callaway and the Modification Agreement dated March 10, 2008;[11]

(9) Yvette listed all business and trade debts on her original Schedule F as joint debts;[12]

---

[5] Callaway's Exhibit No. 6.

[6] Id.

[7] Id.

[8] Callaway's Exhibit No. 17; Callaway's Exhibit No. 18, p. 17.

[9] Callaway's Exhibit No. 15.

[10] Callaway's Exhibit No. 17.

[11] Callaway's Exhibit No. 2.

[12] The Asburys filed an amended Schedule F which changed the designation of the majority of the business debts to those of Kevin's only; however, some of the business debts were left as joint. Callaway's Exhibit Nos. 9

(10) the parties' Schedule B indicates that all of the business assets are jointly owned;

(11) Yvette and Kevin filed joint tax returns; and

(12) Kevin admitted in his deposition testimony that he and Yvette were in the cattle business.[13]

## B. Knowledge

The United States Supreme Court has recognized that a debt may be nondischageable when the debtor personally commits fraud or when actual fraud is imputed to the debtor under agency principles. *Strang v. Bradner*, 114 U.S. 555, 561, 5 S.Ct. 1038, 1885, 29 L.Ed. 248 (1885). In the Eighth Circuit, a partner's liability under § 523(a)(2) may be imputed to an agent or partner even in the absence of evidence that the agent or partner knowingly participated in the fraud. *In re Treadwell,* 423 B.R. 309, 315 (B.A.P. 8th Cir. 2010). There appears to be some question regarding whether recent Eighth Circuit opinions have modified *Strang*, in such a way as to place additional requirements as to an otherwise "innocent" agent or partner when dischargeability is being sought under the theory of vicarious liability. Under *Strang*, the Supreme Court held that a debtor is liable in bankruptcy for the false and fraudulent representations of his partner made in the conduct of partnership business. *Strang*, 114 U.S. at 561. Under *Walker v. Citizens State Bank of Maryville, Missouri, (In re Walker)*, 726 F.2d 452, 454 (8th Cir. 1984) the Eighth Circuit concluded that "more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. [...] If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the

---

and 22.

[13] Callaway's Exhibit No. 21, p.10.

debtor-principal." *Walker*, 726 F.2d at 454. "If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal." *Id. (citing David v. Annapolis Banking & Trust Co.,* 209 F.2d 343, 344 (4th Cir. 1953)).

In this case, the Court previously found the debt nondischargeable as to Kevin under § 523(a)(2)(B). The Court has now determined that Yvette and Kevin were business partners. The Court now turns to the question of whether Callaway has sustained its burden of proof under *Walker* regarding whether Yevette knew or should have know that Kevin presented Callaway with fraudulent financial information or if she was recklessly indifferent to his fraudulent actions. *See Walker*, 726 F.2d at 454.

The following cases provide guidance with regard to how courts have dealt with issues involving spouses and § 523(a)(2)(B). In *W.E. Davis Co. v. Medow (In re Medow)*, 26 B.R. 305 (Bankr. S.D. Fla. 1982), the debtor-wife owned stock in and was the secretary of a corporation. The debtor never actively participated in the management or operation of the corporation. The debtor's husband was the chief operating officer. The debtor's husband gave false financial statements to the creditor. The Bankruptcy Court for the Southern District of Florida held that the debtor was also responsible for the false financial statements and stated, in part:

> The debtor takes the position that these financial statements cannot prevent her discharge because they were statements for Weathershield/Nailite furnished by Robert Medow, as chief operating officer. The court finds, however, that Mrs. Medow was fully aware that the purpose of the agreement ultimately made between the parties was to obtain needed capital for the business, and that her signature was required. Under these circumstances her lack of active participation in the daily operation of the business does not discharge her duty of inquiry; a wife cannot avoid responsibility for her actions simply by stating that her husband requested her signature. *Beneficial Consumer Discount Co. v. Barrett (In re Barrett),* 2 B.R. 296 (Bankr. E.D. Pa. 1980). Although she may not have had actual knowledge of the errors in the statements, she signed the statements to obtain a benefit. The falsity of the representations will therefore be counted against her, because she may

9

Case 09-02012-drd   Doc 45   Filed 01/06/11   Entered 01/06/11 13:43:19   Desc Main
                       Document      Page 10 of 13

not obtain the benefits and repudiate the responsibilities.

*W.E. Davis Co.*, 26 B.R. at 307.

In *Walker v. Citizens State Bank of Maryville, Missouri*, *supra*, the debtor operated a hardware store as a sole proprietor. The Debtor became ill and his wife operated the business for two years. The debtor's wife assigned fictitious accounts receivable to the bank. The bank paid for the assigned accounts by directly depositing $43,000 in the hardware store's bank account. The debtor and his wife used the money to pay both business and personal expenses. The debtor did not know about his wife's scheme. The bank discovered the scheme. It was undisputed that the wife was her husband's agent. The Eighth Circuit Court of Appeals stated in part:

> Proof that a debtor's agent obtains money by fraud does not justify the denial of a discharge to the debtor, unless it is accompanied by proof which demonstrates or justifies an inference that the debtor knew or should have known of the fraud. *In re Lovich*, 117 F.2d 612, 614-15 (2nd Cir. 1941). If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal. *David v. Annapolis Banking & Trust Co.*, 209 F.2d 343, 344 (4th Cir. 1953). In the cases cited to us, the debtors were found to be recklessly indifferent because they had signed false documents without examining them. *Id.; Gardner v. American Century Mortgage Investors*, 577 F.2d 928, 929 (5th Cir. 1978); *In re Santos*, 211 F.2d 887, 889 (7th Cir. 1954); *In re Savarese*, 209 F. 830, 832 (2nd Cir. 1913). Despite the debtors' lack of actual knowledge, the courts in those cases refused to discharge the debts because the debtors had no reason, good or bad, for their lack of knowledge. In other words, the debtors in those cases should have known of the fraud. It is clear, however, that failure to read a document prepared by one's agent before signing it is not the only kind of act which can constitute "reckless indifference." The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud.
>
> Thus, we agree with the district court that more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. However, as indicated, actual participation in the fraud by the principal is not always required. If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal. When the principal is recklessly indifferent to his agent's acts, it can be inferred that the principal should have known of the fraud.

*Walker*, 726 F.2d at 454.

There is no direct evidence that Yvette reviewed the Borrowing Base Certificate, which contained the false financial information, and there are no signatures required on this document. As the Court previously found, Kevin prepared the Certificate and presented it to Callaway in order to induce Callaway to make additional advances on the loan. The fact that Kevin presented the fraudulent document rather than Yvette does not relieve her from responsibility for the consequences of its inaccuracy. Given the facts that Yvette, (1) signed the Note and Security Agreement, (2) that she pledged as security for her loan, all of the livestock that she and Kevin then owned or thereafter acquired, (3) that she represented in the Security Agreement that she owned the Property (the livestock) that she pledged as security, (5) that she represented in the Security Agreement that she would keep the livestock in her possession, but if she sold it, she would have the checks made payable to herself and Callaway, (6) that she knew where the business records were kept,[14] and (7) that she substantially benefitted from the business, leads the Court to the conclusion that she could and should have known how many cattle they owned at any given time. Furthermore, she could and should have known exactly what information her business partner was reporting to Callaway regarding their loan and their collateral. To plead ignorance of this fact is deceitful or at the very least reckless. The fact that she did not accept the responsibility of actually reviewing the financial documents conveyed to Callaway regarding a business in which she jointly owned assets does not relieve her of being accountable for recklessness.

The Court finds that Yvette and Kevin were acting as partners engaged in the business of

---

[14] Callaway's Exhibit No. 18, p. 13.

buying and selling cattle. Yvette's attempt to distance herself from the partnership by giving evasive responses at her deposition to questions about the business,[15] whether she knew what a security interest was,[16] or whether she recalls writing checks from any of the parties' accounts, when the evidence clearly establishes that she had written numerous such checks, a vast majority of which were draws for herself,[17] only bolsters the Court's finding that she was Kevin's business partner.

Although Yvette received adequate notice of the trial held before the Court on November 18, 2010, she failed to appear and present testimony on her behalf. "As bankruptcy adversary proceedings are civil proceedings, an adverse inference may be drawn against a party when they refuse to testify in response to probative evidence offered against them." *In re McGohan*, 75 B.R. 10, 12 (Bankr. N.D. N.Y. 1986). Absent any information from Yvette to the contrary, coupled with her less than forthright deposition testimony, the Court can only infer that her failure to appear was strategic and deliberate, and that her testimony would have been unfavorable to her case.

The Court concludes that Yvette, as Kevin's business partner, should have known that the financial information that her partner provided to Callaway in the Borrowing Base Certificate was fraudulent. Additionally, the Court finds that her real or feigned ignorance of the fact that Kevin provided Callaway with false financial information rises to the level of recklessness and, therefore; Kevin's fraud is imputed to Yvette under partnership principles and her debt owed to

---

[15] See generally Callaway's Exhibit No. 18.

[16] Callaway's Exhibit No. 18, p. 44.

[17] Callaway's Exhibit No. 18, p. 33; Callaway's Exhibit No. 6.

Callaway is nondischargeable under §523(a)(2)(B).

### III.  CONCLUSION AND ORDER

For the reasons stated above, Yvette's debt owed to Callaway in the amount of $3,071,599.88 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

Because the Court found the debt nondischargeable under § 532(a)(2)(B), the Court specifically makes no findings regarding nondischargeability under §§ 523(a)(2)(A), (a)(4) or 523(a)(6).

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.  A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

ENTERED this 6th day of January, 2011.

/s/ Dennis R. Dow
United States Bankruptcy Judge

Copies to:
James F. B. Daniels
J. Brian Baehr